**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | Civ. No. 26-1968 |
| $2,015,599.46 SEIZED FROM A ) | |
| JPMORGAN CHASE BANK ACCOUNT ) | |
| ENDING IN -3371 AND HELD IN THE ) | |
| NAME OF SAFEWAY ) | |
| TRANSPORTATION LLC ) | |
| ) | |
| and ) | |
| ) | |
| $2,183.85 SEIZED FROM A JPMORGAN ) | |
| CHASE BANK ACCOUNT ENDING IN - ) | |
| 1660 AND HELD IN THE NAME OF ) | |
| ABDISAID MOHAMED, ) | |
| ) | |
| Defendants-in-rem. ) | |

**<u>VERIFIED COMPLAINT FOR FORFEITURE *IN REM*</u>**

Plaintiff, United States of America, brings this complaint in accordance with

Supplemental Rule G(2) of the Supplemental Rules for Certain Admiralty or Maritime Claims

and Asset Forfeiture Actions and alleges as follows:

**<u>NATURE OF THE ACTION</u>**

1.      This is a civil action *in rem* to forfeit and condemn to the use and benefit of the

United States of America property constituting or derived from proceeds traceable to violations

of 18 U.S.C. §§ 1347 and 1349 that is subject to civil forfeiture pursuant to 18 U.S.C.

§ 981(a)(1)(C) and 18 U.S.C. § 984 and property involved in or traceable to transactions in

1

violation of 18 U.S.C. §§ 1956 and 1957 that is subject to civil forfeiture pursuant to 18 U.S.C.

§ 981(a)(1)(A) and 18 U.S.C. § 984.

## DEFENDANTS *IN REM*

2.      The defendants *in rem* consist of $2,015,599.46 in funds contained in a JPMorgan

Chase Bank account held in the name of Safeway Medical Transportation LLC and ending in

3371 and $2,183.85 funds contained in a JPMorgan Chase Bank account held in the name of

Abdisaid Mohamed and ending in 1660. (hereinafter the "Defendant Property")

3.      The Defendant Property was received by the Federal Bureau of Investigation

(FBI) in the District of New Mexico pursuant to a seizure warrant issued by this Court in Case

No. 26-mr-670 on April 3, 2026.

4.      Defendant Property is now, and during the pendency of this action will be, in the

jurisdiction of this Court.

5.      Upon the filing of this complaint, the United States will arrest the Defendant

Property by execution of a Warrant for Arrest *in Rem* in the District of New Mexico.

## JURISDICTION AND VENUE

6.      The United States District Court for the District of New Mexico has subject

matter jurisdiction pursuant to 28 U.S.C. §§ 1345, 1355(a), and 1356.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395, as acts or

omissions giving rise to the forfeiture took place in this district and the property is found within

the District of New Mexico.

**FACTS**

The Medicaid Program

1.      The New Mexico Medicaid Program ("Medicaid") was a health care program funded by the United States government and the State of New Mexico ("State"), and administered by the State, that provided benefits to qualifying individuals based on their income and other factors.

2.      Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3.      Individuals receiving benefits under Medicaid were referred to as Medicaid "beneficiaries." Medicaid beneficiaries were issued beneficiary identification cards that certified eligibility for Medicaid and identified each beneficiary by a unique number.

4.      Health care providers and providers of services to support the delivery of health care for Medicaid beneficiaries were referred to as Medicaid "providers."

5.      To enroll in Medicaid and receive reimbursements for providing qualifying services, a provider was required to complete a provider enrollment application. In the New Mexico Medicaid Provider Participation Agreement, the provider agreed as follows: "I understand that the payment of claims will be from federal and state funds and that any falsification or concealment of a material fact may be prosecuted under federal and state law." The provider further agreed to abide by all federal, state, and local laws, rules, and regulations, and to be responsible for the accuracy and validity of all claims for which reimbursement is sought.

6.      Health care providers used Healthcare Common Procedure Coding System ("HCPCS") codes to submit claims to federal health care programs such as Medicaid. HCPCS codes were a uniform system used across the medical industry to describe services delivered by

providers. On their claims, Providers indicated the HCPCS codes that corresponded to the type of procedure or service for which Medicaid was being billed. Providers typically submitted claims electronically to Medicaid.

<u>Non-Emergency Medical Transportation Services</u>

7.     Non-emergency medical transportation ("NEMT") services involve the transport of Medicaid beneficiaries to and from appointments for non-emergency medical services, such as routine doctors' appointments, when they had no access to transportation by personal vehicle or public transportation. NEMT services were provided in vehicles such as taxis, cars, and vans.

8.     Medicaid covered NEMT services when they were reasonable and necessary to enable Medicaid recipients to attend qualifying medical appointments and provided as represented.

9.     NEMT providers in New Mexico delivered essential services for individuals who lacked reliable means to reach their non-emergency medical appointments. These services ensured that Medicaid beneficiaries in New Mexico received timely medical care, reduced missed appointments, and supported better health outcomes, especially within underserved communities.

10.     NEMT claim submissions were required to include information such as the name of the Medicaid beneficiary, the Medicaid beneficiary number, the distance traveled, and the date of service.

11.     NEMT claims were submitted using HCPCS codes that described the specific services provided. NEMT providers in New Mexico primarily used HCPCS codes A0100 and T2001.

12.     HCPCS code A0100 denoted a trip provided in a taxi or other non-wheelchair van or ambulance. Medicaid paid a set dollar amount per mile for A0100 claims and set a maximum

amount—and therefore, a maximum mileage—that it would reimburse for each one-way leg of an A0100 claim.

13.    HCPCS code T2001 denoted a trip taken by a beneficiary attendant or escort, in situations where there was a medical certification that the beneficiary needed such an attendant or escort.

14.    NEMT providers were required to maintain certain paper forms documenting every trip taken for which claims were submitted to Medicaid. Providers were required to fill out the forms, have them signed by the beneficiary, the medical provider to whom the beneficiary was being transported, and the driver, and retain them in their records. The relevant forms were known as Forms 295 and 296.

15.    The recipient of a transport was required to sign and attest on Form 295 as follows: "I do not have a vehicle," "I do not have anyone to transport me to my medical service provider," and "do not have access to other transportation such as bus service." The recipient acknowledged that false information may result in "criminal actions as appropriate."

The Health Care Fraud Conspiracy

16.    Safeway Medical Transportation LLC ("Safeway") was a New Mexico limited liability corporation doing business within the District of New Mexico.

17.    Abdisaid Mohamed ("Mohamed") was the owner and registered agent of Safeway. He established, operated, and controlled Safeway and employed administrative staff to run the company. Mohamed, together with and through Safeway's administrative staff, instructed drivers as to how to provide NEMT services and submitted claims for purported NEMT services to Medicaid.

18.     Safeway purported to provide NEMT services to Medicaid beneficiaries living in New Mexico who claimed they needed rides to appointments in locations throughout New Mexico. Safeway employed multiple drivers either directly or as independent contractors.

19.     Most of the NEMT trips billed by Safeway were trips to and from Alcoholics Anonymous ("AA") meetings that were located at great distances from the Medicaid beneficiaries' residences. AA does not keep records of attendance or membership, making verification of the trips difficult or impossible.

20.     A review of claims data from Medicaid and underlying documents submitted by Safeway to the New Mexico Department of Justice identified numerous instances of overbilling and false billing, including claims for beneficiaries supposedly taking more than one long-distance trip back and forth to the same provider, usually AA meetings, in a single day; separate claims for multiple children also going to and from the same AA meetings each day in the same vehicle as their parent/driver; and millions of dollars in claims in which Safeway drivers purportedly were the Medicaid beneficiaries being taken to and from medical appointments, usually AA meetings, despite having access to personal and/or Safeway-owned cars to use for transportation. As part of the scheme, Safeway usually billed at or near the maximum allowed mileage for each leg of a trip in its claims.

21.     Safeway drivers and employees falsified, altered, and caused the falsification and alteration of Forms 295 and 296 to, among other things, (i) show that one Safeway driver was being transported by another Safeway driver when, in fact, the drivers were driving themselves; (ii) reflect trips that did not occur; (iii) falsely attest to the transportation of individuals who were ineligible to receive NEMT services, (iv) reflect the presence of a necessary medical attendant when there was none, and (v) reflect mileage and distances that were fabricated.

22.    Between January 1, 2021, and December 31, 2025, Medicaid paid Safeway approximately $5,659,734 for claims in which Safeway drivers were listed as beneficiaries of NEMT services from Safeway.

| Year | 2021 | 2022 | 2023 | 2024 | 2025 | TOTAL |
|---|---|---|---|---|---|---|
| Claims | 3,839 | 1,988 | 8,104 | 9,570 | 1,596 | 25,097 |
| Amount | $820,400 | $448,455 | $1,838,971 | $2,186,257 | $365,651 | $5,659,734 |

23.    Records also show that Medicaid paid Safeway millions of dollars more for trips provided to children and other relatives of Safeway drivers. Where minor children were transported, Safeway often submitted claims for a medical attendant in addition to the claim for the transport of the minor child.

Flow of Funds Derived from the Fraudulent Scheme

24.    Proceeds traceable to the above-described health care fraud scheme were deposited into JPMC x3371 and JPMC x1660, and, at the time of seizure, the accounts contained property involved in money laundering. Initially, Safeway maintained an account with Bank of America ending in 5862 (BOA x5862), and funds constituting criminally derived property paid from Medicaid for Safeway's Medicaid claims were deposited into BOA x5862. BOA x5862 was closed in 2025, and the remaining criminally derived property was transferred to JPMC x3371. Both BOA x5862 and JPMC x3371 engaged in money laundering of criminally derived property.

25.    Similarly, JPMC x1660 received criminally derived property from multiple accounts held by Safeway, including BOA x5862 and JPMC x3371.

26.    **The Medicaid Accounts**: Analysis of Safeway accounts BOA x5862 and JPMC x3371 revealed deposits from Medicaid totaling $35,216,157 between January 1, 2021, and

December 30, 2025. Deposits from Medicaid account for the vast majority of deposits into BOA x5862 and x3371. The following chart summarizes the total amount of Medicaid funds deposited into BOA x5862 and JPMC x3371 by year.

| ACCOUNT | 2021 | 2022 | 2023 | 2024 | 2025 | TOTAL |
|---|---|---|---|---|---|---|
| BOA X5862 | $3,170,719 | $3,858,859 | $7,958,494 | $11,264,824 | $7,253,474 | $33,506,370 |
| JPMC X3371 | $0 | $0 | $0 | $0 | $1,709,787 | $1,709,787 |
| TOTAL | $3,170,719 | $3,858,859 | $7,958,494 | $11,264,824 | $9,668,053 | $35,216,157 |

27.     Analysis of BOA x5862 showed that deposits from Medicaid occurred approximately once per week. From January 1, 2021, through December 31, 2025, in the time period discussed above during which Safeway appears to have fraudulently billed Medicaid for NEMT for an impossible number of miles, an impossible number of trips in one day, multiple trips to the same provider, with Safeway's own drivers and their children as beneficiaries, BOA x5862 received 245 separate deposits from Medicaid totaling $33,506,370.

28.     As described above, at least $5.6 million of the Medicaid funds deposited into BOA x5862 can be directly traced to claims where drivers were fraudulently claimed to be passengers in need of transport. However, as indicated, numerous fraudulent billing schemes were revealed during the course of the investigation, including trips that could not have occurred and fraudulent billing for many millions of dollars for the drivers' own children.

29.     Almost all funds were transferred out of BOA x5862 in September 2025, following the opening of JPMC x3371 on or about September 16, 2025. JPMC x3371 was funded by an opening deposit of a cashier's check in the amount of $250,000. This cashier's check came from BOA x5862, which constitutes a monetary transaction greater than $10,000 with proceeds of

Safeway's illegal activity. Tracing confirms that the entirety of the $250,000 deposit came from Medicaid funds. BOA x5862 then transferred an additional $74,627.91 to JPMC x3371 in two transfers at the end of September 2025, both constituting almost entirely criminally derived property.

30.     It appears that JPMC x3371 then replaced BOA x5862 as Safeway's operating account at this time, including as the account to which Medicaid paid the proceeds of Safeway's scheme. Between October 21, 2025, and December 30, 2025, 11 payments from Medicaid were sent to JPMC x3371, totaling $1,709,787.

31.     In sum, JPMC x3371 was funded by, and contained at the time of the court-authorized seizure, criminally derived property from Safeway's Medicaid scheme.

32.     Additionally, between January 1, 2021, and December 31, 2025, over 200 monetary transactions greater than $10,000, totaling over $10.9 million, were conducted involving criminally derived proceeds that had been deposited into BOA x5862 and JPMC x3371. The vast majority occurred out of the BOA x5862 account, due to the time period in which that account served as Safeway's operating account. Those transactions involving criminally derived property are summarized below, followed by details of similar additional transactions involving criminally derived property conducted out of JPMC x3371, the account from which the bulk of the funds at issue were seized.

33.     BOA x5862 conducted 27 transactions sending funds from Safeway to a money service business located in Minnesota with a primary customer base of East African individuals who send funds to East Africa and the Middle East ("Company 1"). The 27 transactions between Safeway and Company 1 totaled $987,495, between November 2, 2021, and January 22, 2025, using Medicaid funds. Agents reviewed records maintained by Company 1 for the time period

between September 2, 2024, and February 28, 2025. During this period, funds sent from Safeway BOA x5862 to Company 1 were then used to send funds to various individuals in Somalia, Kenya, South Africa, United Arab Emirates, Sudan, Egypt, and Djibouti.

34.     JPMC x3371 then picked up this pattern of transactions involving criminally derived property with a cashier's check payable to Company 1 in the amount of $90,000, purchased from JPMC x3371 on or about November 6, 2025.

35.     Similarly, funds totaling $1,580,680 were sent via 10 separate international wire transfers, from BOA x5862 and JPMC x3371, to an account in the name of Safeway Rapid Transport ("SRT"), held at Premier Bank Kenya, between August 1, 2024, and December 31, 2025. An open-source search revealed SRT is involved in the transportation of petroleum products by road in Kenya. The first nine wire transfers of criminally derived property, from BOA x5862, ranged from $50,030 to $350,030, and were noted as for "Services." The final wire transfer of criminally derived property, from JPMC x3371 on December 31, 2025, was for $50,000, and stated it was for a "Real Estate Purchase."

36.     Additional monetary transactions with criminally derived property deposited into JPMC x3371 were conducted, including the purchase of a cashier's check on December 3, 2025, in the amount of $50,000, made payable to Shiqow Ali Abdi, and the following five payments to Mohamed's American Express account, each in amounts greater than $10,000:

| DATE | AMOUNT |
| --- | --- |
| 10/27/2025 | $18,011,28 |
| 11/10/2025 | $14,753.60 |
| 12/10/2025 | $12,000.00 |

| 12/12/2025 | $12,765.14 |
|---|---|
| 12/12/2025 | $12,765.14 |

37.     Additionally, Safeway transferred money from its accounts to Mohamed's account. In total, records show that Mohamed received at least $1,120,965 from Safeway during the course of the scheme.

38.     These transfers occurred in multiple ways, leading to money contained in Mohamed's JPMC x1660 account, which also contained proceeds of Safeway's fraud at the time of the seizure. This includes:

a.     Safeway's BOA x5862 directly transferred approximately $319,233 to Mohamed's first personal account, BOA x5870, including $80,000 to fund the account on April 11, 2022, followed by $37,000 in interbank transfers and approximately $202,233 via Zelle. These transfers consisted of proceeds of Safeway's health care fraud scheme, detailed above.

b.     Mohamed's first personal account, BOA x5870, received approximately $581,735 in the form of direct deposits of purported payroll, through Safeway's payroll company, ADP; those funds originated from Safeway's BOA x5862 and JPMC x3371 and were proceeds of Safeway's health care fraud scheme.

c.     An additional $50,000 in Safeway's criminally derived property reached Mohamed's first personal account, BOA x5870, through a November 2022 bank check drawn on another Mohamed BOA bank account, using funds originating from Safeway's x5862 account.

d.     Mohamed opened his current JPMC account, x1660, on June 11, 2024, with a signature card indicating that Mohamed is the sole signer.

11

e.    JPMC x1660 then received Zelle payments totaling $2,700 from Mohamed's BOA x5870 account, all of which is traceable to criminally derived property in that account.

f.    JPMC x1660 received $43,850 from Safeway's BOA x5862 and Safeway's JPMC x3371 between September 9, 2024, and January 13, 2026, via Zelles and interbank transfers, all of which is traceable to criminally derived property.

39.    JPMC x1660 received $76,146.99 in the form of direct deposits of purported payroll, through Safeway's payroll company, ADP; those funds originated from Safeway's JPMC x3371 and were proceeds of Safeway's health care fraud scheme. Together, this constitutes $122,696.99 in criminally derived property transferred to Mohamed's JPMC x1660 account.

### CLAIMS FOR RELIEF

40.    The United States incorporates by reference the allegations in paragraphs 1 through 39 as if fully set forth herein.

41.    Title 18, United States Code, Section 981(a)(1)(A) provides, in pertinent part, for the forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957, or any property traceable to such property.

42.    Title 18, United States Code, Section 981(a)(1)(C) provides, in pertinent part, for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting specified unlawful activity, as defined in 18 U.S.C. § 1956(c)(7).

43.    Title 18, United States Code, Section 984 provides that, in any forfeiture action *in rem* in which the subject property is funds deposited in an account in a financial institution, it is not necessary for the United States to "identify the specific property involved in the offense that

is the basis for the forfeiture." Any "identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture" is subject to forfeiture. 18 U.S.C. § 984(a)(2).

44. Title 18, United States Code, Section 1956(c)(7)(F) provides that the term "specified unlawful activity" means, among other things, "any act or activity constituting an offense involving a Federal health care offense."

45. Title 18, United States Code, Section 24 defines the term "Federal health care offense" to include, *inter alia*, a violation of, or a criminal conspiracy to violate, 18 U.S.C. §§ 1347 and/or 1349.

46. Title 18, United States Code, Section 1347 provides, in pertinent part, that whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice to (1) defraud any health care benefit program or (2) obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any healthcare benefit program shall be fined or imprisoned not more than 10 years, or both.

47. Title 18, United States Code, Section 1956 provides, in pertinent part, that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity, or knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, shall be sentenced to a fine of not more than $500,000 or

twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

48.   Section 1956 further provides, in pertinent part, that whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer, a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the property involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both.

49.   Title 18, United States Code, Section 1957 provides, in pertinent part, that whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished with a fine under Title 18 of the United States Code, imprisonment for not more than ten years, or both.

50.   Defendant Property constitutes property involved in transactions in a violation of 18 U.S.C. § 1347, and/or conspiracy to commit said offense, or is derived from proceeds traceable to said offense, and is thus subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

51.     Defendant Property constitutes property involved in violations of 18 U.S.C. §§ 1956 and 1957, and/or conspiracy to commit said offenses, or is traceable to transactions and is thus subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**WHEREFORE:** Plaintiff seeks the arrest of Defendant Property and forfeiture of the same to Plaintiff, the determination of the validity and priority of claims of the claimants and any unknown claimants to the Defendant Property, costs and expenses of seizure and of this proceeding, and any further relief deemed just and proper. Respectfully submitted,

TODD BLANCHE
Acting Attorney General

RYAN ELLISON
First Assistant United States Attorney

KATHERINE L. LEWIS
Assistant United States Attorney
201 Third Street NW, Suite 900
Albuquerque, New Mexico 87102
(505) 346-7274
Fax (505) 346-7205

15

### 28 U.S.C. § 1746 Declaration

I am a Special Agent with the Federal Bureau of Investigation who has read the contents of the Complaint for Forfeiture *In Rem* to which this Declaration is attached; and the statements contained in the complaint are true to the best of my knowledge and belief.

I declare under penalty of perjury and the laws of the United States of America that this Declaration is true and correct, except as to matters stated on information and belief, and as to those matters, I believe them to be true.

Dated: June 18, 2026

Raymond Mauk
Federal Bureau of Investigation